## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**TRAVIS RYAN, *et al.*,**

        **Plaintiffs,**

      **v.**

**FLAGSTAR BANK, FSB,**

       **Defendant.**

:

:

**Case No. 2:23-cv-0484**
**Chief Judge Sarah D. Morrison**
**Magistrate Judge Kimberly A. Jolson**

## <u>OPINION AND ORDER</u>

Travis Ryan and Megan Malone filed this Real Estate Settlement Practices Act ("RESPA") action against Flagstar Bank, FSB for allegedly mishandling attempts to modify the terms of their mortgage loan when the COVID pandemic caused them financial hardship. (Am. Compl., ECF No. 32.) The matter is now before the Court on Flagstar's Motion for Summary Judgment (ECF No. 66) and Motion to Strike (ECF No. 79). Both Motions are fully briefed and ripe for consideration.

## I.    STATEMENT OF FACTS

Mr. Ryan and Ms. Malone, an unmarried couple, bought a home together in October 2018. (Gossett Decl., ECF No. 66-1, ¶ 2.) They financed the home using a note and mortgage now held by Flagstar. (*Id.*) Because Mr. Ryan was married to Taijuana Ryan at the time the mortgage was executed, Taijuana signed the mortgage for the sole purpose of releasing her dower interest in the home.[1] (Ryan

---

[1] Under Ohio's dower law, whenever a married person buys real property

Draft 3 – June 12, 2025

Decl., ECF No. 73, ¶¶ 3–6; Ex. A-2, ECF No. 66-3.) The Ryan's divorce was finalized in February 2020. (Ex. A-30, ECF No. 66-31.)

Like so many, Mr. Ryan experienced a significant reduction in income when the COVID-19 pandemic took hold. (Ryan Decl., ¶¶ 10–11.) The hardship caused Plaintiffs to enter Flagstar's mortgage payment forbearance program. (*Id.*, ¶ 13; Gossett Decl., ¶¶ 7–11.) Before the forbearance period ended, Flagstar notified Plaintiffs they could pursue a "mortgage reset." (Ex. A-9, ECF No. 66-10.) This notice brought Plaintiffs into Flagstar's "loss mitigation" program. According to the Consumer Financial Protection Bureau, "[l]oss mitigation refers to the steps mortgage servicers take to work with a mortgage borrower to avoid foreclosure." CFPB Consumer Education, https://www.consumerfinance.gov/ask-cfpb/i-got-a-letter-from-my-mortgage-servicer-about-my-application-for-help-to-prevent-foreclosure-of-my-mortgage-can-you-help-me-understand-some-of-the-terms-en-1807/ (last visited June 9, 2025). The loss mitigation options presented to Plaintiffs included: reinstatement under the existing mortgage terms; a repayment plan; a partial claim, which is used to delay repayment of past-due amounts until the loan matures; and modification of the loan terms. (Ex. A-9.)

### A. December 2021 Loan Modification Offer

Plaintiffs first sought to modify their loan in November 2021. (Gossett Decl.,

---

without their spouse, the non-title-holding spouse retains a one-third interest in that property. *Ferraro v. Cristiano*, No. 23146, 2009 WL 2915617, at *9 (Ohio Ct. App. Sept. 11, 2009) (citing Ohio Rev. Code § 2103.02).

Draft 3 – June 12, 2025

¶ 18.) On December 21, 2021, Flagstar offered Plaintiffs a loan modification with a partial claim, including a monthly payment of $2,405.16 and a 3.125% interest rate. (Ex. A-21, ECF No. 66-22.) Plaintiffs would have accepted the December 2021 Offer, but the paperwork incorrectly stated that Mr. Ryan was still married to Taijuana and required her signature. (Ryan Decl., ¶¶ 15–16; Malone Dep., ECF No. 63, 71:21–72:14.) Although Mr. Ryan's divorce had been final for over a year, Flagstar had not been made aware. Mr. Ryan called Flagstar on December 23, to notify them of the error. (Ex. A-22, *manually filed*.) A Flagstar agent told him that the offer paperwork was based on the title report. (*Id*.) The agent later apologized and said that Taijuana should not have been included as a signatory, and that Flagstar would send Plaintiffs corrected paperwork. (*Id*.) But Flagstar did not. (*Id*.)

Mr. Ryan spoke to another Flagstar agent on December 31, to let them know that he had not received the corrected paperwork. (Ex. A-25, *manually filed*.) The agent assured Mr. Ryan that the corrected paperwork was forthcoming. (*Id*.) But a third Flagstar agent told Mr. Ryan on January 14, that he needed to send a quitclaim deed from Taijuana. (Ex. A-23, *manually filed*.) Mr. Ryan pushed back, explaining that Taijuana was not on the title and had released her dower rights. (*Id*.) By the end of the January 14 call, the Flagstar agent agreed with Mr. Ryan, and said that "[she] was not sure why a quitclaim deed was even requested." (*Id*.) She told Mr. Ryan that she would get the paperwork reprinted and sent. (*Id*.)

Twelve days later, Plaintiffs still had not received corrected paperwork. Mr. Ryan called Flagstar again. (Ex. A-24, *manually filed*.) This time, the Flagstar

Draft 3 – June 12, 2025

agent mistakenly told Mr. Ryan that it had received a quitclaim deed and would "follow up . . . about the [offer] documents being redrafted[.]" (*Id.*)

Flagstar did not send corrected paperwork before the December 2021 Offer expired on February 11, 2022. (Ex. A-26, ECF No. 66-27; Gossett Decl., ¶ 23.)

### B. April 2022 Loan Modification Offer

Shortly after the December 2021 Offer expired, Plaintiffs applied again for a loan modification. (Gossett Decl., ¶ 26.) This time, a Flagstar agent told Mr. Ryan right away, on February 22, that Taijuana would appear on the offer paperwork unless Flagstar received a divorce decree and a quitclaim deed from Taijuana. (Ex. A-28, *manually filed*.) Mr. Ryan submitted his divorce decree one week later. (Ex. A-30, ECF No. 66-31.) And he told a Flagstar agent that he was "working on" getting a quitclaim deed. (Ryan Dep. Tr. 1, ECF No. 64, 116:6–14)

On April 11, 2022, Flagstar offered Plaintiffs another loan modification with a partial claim, including a monthly payment of $2,769.52 and a 4.75% interest rate. (Ex. A-31, ECF No. 66-32.) Taijuana was included on the offer paperwork. (*Id.*)

Two days later, Mr. Ryan spoke to a Flagstar agent about the offer. (Ex. A-34, ECF No. 66-35.) The agent reminded Mr. Ryan to submit Taijuana's quitclaim deed, but Mr. Ryan objected because, based on his review of the title, Taijuana had no rights in the property. (*Id.*) Mr. Ryan also told the Flagstar agent that he and Ms. Malone could not afford the April 2022 Offer terms. (*Id.*) The agent advised Mr. Ryan that he could try to get more favorable offer terms by submitting a letter explaining his financial hardship. (*Id.*) Later that day, Mr. Ryan sent Flagstar a

4

Draft 3 – June 12, 2025

letter explaining that a quitclaim deed was unnecessary, and that Plaintiffs could

not afford the April 2022 Offer. (Ex. A-32, ECF No. 66-33.) Plaintiffs did not accept

the April 2022 Offer before it expired. (Gossett Decl., ¶ 34.)

### C. August 2022 Loan Modification Offer

Plaintiffs applied a third time. In August 2022, Flagstar sent a loan

modification with partial claim offer, including a monthly payment of $2,723.53 and

an interest rate of 5.375%. (Ex. A-45, ECF No. 66-46.) This offer stated that Mr.

Ryan was unmarried, and did not reference Taijuana anywhere. (*Id*.) But Plaintiffs

did not accept the August 2022 Offer—they wanted the December 2021 Offer terms.

(Ryan Dep. Tr. 2, ECF No. 65, 47:6–8.)

### D. September 2022 Qualified Written Request ("QWR")

On September 21, 2022, Plaintiffs' counsel sent a QWR asking Flagstar to

explain (among other things) why the interest rates were different as between the

December 2021 Offer and the August 2022 Offer. (*Id*.) Plaintiffs also asked Flagstar

to provide (among other things) recordings and transcripts of all phone calls related

to the loan modification applications, and all call logs and written communications

pertaining to same. (*Id*.)

Flagstar responded to the QWR in October 2022. (Ex. A-49, ECF No. 66-50.)

Notably, Flagstar did not explain the difference in interest rates. (*Id*.) But it did

offer to honor the December 2021 Offer. (*Id*., PAGEID # 2096.) Flagstar also

represented that it was "unable to honor the request for all written correspondence

call logs, servicing logs, or audio recording . . ., transcripts of all phone calls, written

Draft 3 – June 12, 2025

statements and supporting documents because it is considered overbroad an unduly burdensome to provide[.]" (*Id.*, PAGEID # 2097.)

## II.    MOTION TO STRIKE

The Court will first address Flagstar's motion to strike certain paragraphs of Mr. Ryan's Declaration submitted in response to the Motion for Summary Judgment. In particular, Flagstar moves to strike Paragraphs 15, 16, 23, 34, and 47 on the grounds that they are either inadmissible hearsay or contradictory to Mr. Ryan's deposition testimony. (ECF No. 79.)

Motions to strike non-pleadings are generally disfavored; the preferred approach is simply for the Court to ignore the inadmissible evidence. *See O'Banion v. Am. Aggregates Corp.*, No. 1:19-CV-841, 2020 WL 13469259, at \*2 (S.D. Ohio July 23, 2020) (Bowman, M.J.). Whether to grant such a motion is within this Court's sound discretion. *Id.* at \*1.

### A.    Inadmissible Hearsay

Flagstar first argues that Mr. Ryan's references to Ms. Malone's intentions and motivations in Paragraphs 15, 16, and 47 are inadmissible hearsay. Federal Rule of Civil Procedure 56(c)(4) requires that affidavits be based on personal knowledge, not hearsay statements. *Jones v. McGrath*, No. 1:12-cv-946, 2014 WL 4388262, at \*12 n.11 (S.D. Ohio Sept. 5, 2014) (Weber, J.) (citation omitted). Plaintiffs do not defend the challenged paragraphs. (ECF No. 80, PAGEID # 2387.) Instead, they ask the Court to strike only the inadmissible portions attributed to Ms. Malone, leaving the remaining paragraphs intact. (*Id.*) Because "the Court

Draft 3 – June 12, 2025

should use 'a scalpel, not a butcher knife[,]' . . . it is appropriate for the Court to strike [only] portions of affidavits that do not satisfy the requirements." *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 470 (N.D. Ohio 2007) (quoting *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315–16 (1st Cir. 2001)). Thus, the hearsay statements are stricken.

### B.     Contradictions to Mr. Ryan's deposition testimony.

Flagstar next argues that Paragraphs 23 and 34 should be stricken because they contradict Mr. Ryan's deposition testimony. In response to a summary judgment motion, an affidavit that "directly contradicts prior sworn testimony should be stricken 'unless the party opposing summary judgment provides a persuasive justification for the contradiction.'" *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (quoting *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006)). "If the affidavit does not directly contradict prior sworn testimony, it should be stricken if it is 'an attempt to create a sham fact issue.'" *Id.* (quoting *Aerel*, 448 F.3d at 908-09).

Flagstar argues that Paragraph 23 contradicts Mr. Ryan's deposition testimony, alleging that he admitted that Flagstar said it would "probably" send new paperwork and that Flagstar did not make him any guarantees, including as to the terms of the loan. (ECF No. 79, PAGEID # 2382.)  The Court has reviewed Mr. Ryan's declaration and compared it to his deposition. Paragraph 23 covers the same ground as Mr. Ryan's deposition and is consistent with it. Indeed, Paragraph 23

Draft 3 – June 12, 2025

addresses what he *understood* from the December 2021 phone calls, and his deposition testimony affirms the same. (*See* Ryan Dep. Tr. 1, 46:6-14)

Regarding Paragraph 34, Flagstar argues that Mr. Ryan testified at the deposition that he did not recall when he resubmitted certain documents to Flagstar, so he cannot testify via declaration that he was asked to resubmit documents in "early March 2022." (ECF No. 79, PAGEID # 2382.) Plaintiffs do not oppose striking "early March 2022" from Paragraph 34. (ECF No. 80, PAGEID # 2388.) This statement is stricken.

Accordingly, Flagstar's Motion to Strike (ECF No. 79) is **GRANTED in part.** The hearsay statements in Paragraphs 15, 16, and 47, and the reference to March 2022 in Paragraph 34, are hereby **STRICKEN**. The Motion is otherwise **DENIED**.

## III. MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed

8

Draft 3 – June 12, 2025

in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

### A.    Count I: RESPA Loss Mitigation Violation

Plaintiffs' Count I alleges that Flagstar failed to exercise reasonable diligence as required by RESPA for both the December 2021 and April 2022 loan modification applications.

RESPA is a consumer protection statute regulating the real estate settlement process. 12 U.S.C. § 2601, *et seq*. It was enacted

> to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country.

12 U.S.C. § 2601(a). Though originally intended to protect consumers in the negotiation and execution of mortgage contracts, its scope has been broadly construed to encompass loss mitigation, as well. *Id*.

9

Draft 3 – June 12, 2025

RESPA's implementing regulations, known as Regulation X, set out procedures for evaluating a borrower's eligibility for loss mitigation options. 12 C.F.R. § 1024.41. Notable here, when a mortgage servicer receives a borrower's loss mitigation application, the servicer "shall exercise reasonable diligence in obtaining documents and information to complete" that application. 12 C.F.R. § 1024.41(b)(1). A servicer may be liable for actual damages if it fails to do so. 12 U.S.C. § 2605(f)(1)(A). A "typical" reasonable diligence claim arises when "a servicer erroneously requested documents or information it already had or should not have otherwise requested." *Hurst v. Caliber Home Loans, Inc.*, 44 F.4th 418, 425–26 (6th Cir. 2022). A claim may also arise when a servicer makes misleading or conflicting requests or fails to promptly request necessary documents and information. *Id.*

Broadly, Flagstar argues that it is entitled to summary judgment on Count I because the reasonable-diligence requirement did not apply to its handling of the December 2021 or April 2022 Offers.[2] Flagstar further argues that, regardless of whether the requirement applied, it was reasonably diligent in handling those Offers.

**1. December 2021 Loan Modification Offer**

The Court turns first to Flagstar's handling of the December 2021 Offer.

---

[2] In its reply, Flagstar argues for the first time that Plaintiffs' request to correct the paperwork is akin to a request to change the specific offer terms, which does not trigger reasonable diligence by the mortgage servicer. (ECF No. 78, PAGEID # 2361.) The Court will not consider arguments raised for the first time in a reply brief. *Probst v. Cent. Ohio Youth Ctr.*, 511 F. Supp. 2d 862, 871 (S.D. Ohio 2007) (Marbley, J.).

Draft 3 – June 12, 2025

### a) Flagstar was subject to the reasonable diligence requirement.

Flagstar argues that it was not required to exercise reasonable diligence in connection with the December 2021 Offer because that Offer was made based on an incomplete application. The Court disagrees.

In Flagstar's view, Plaintiffs' application was incomplete because it did not include a quitclaim deed from Taijuana or a divorce decree. (Mot., PAGEID # 1573 (citing 12 C.F.R. § 1024.41(a)).) A servicer can make an offer based on either an incomplete or complete application. *See* 12 C.F.R. § 1024.41(c). A loss mitigation application is complete when no other information is needed for the servicer to assess the borrower's eligibility. 12 C.F.R. §§ 1024.41(b)(1), (c)(2)(i). Servicers have an obligation to "exercise reasonable diligence" in requesting and obtaining information necessary to complete the loan modification application. 12 C.F.R. § 1024.41(b)(1). If, after its initial review of an application, a servicer discovers that it needs additional information, it must "promptly request missing information or corrected documents" and "give the borrower a reasonable opportunity to complete the application." 12 C.F.R. § 1024.41(c)(2)(iv).

Before making an offer based on an incomplete application, a servicer must notify the borrower that the application is incomplete, and give the borrower sufficient time to complete it. 12 C.F.R. § 1024.41(b)(2)(i). If a servicer instead makes an offer based on an incomplete application, it may not be required to exercise reasonable diligence in obtaining the information that would complete the borrower's application. *See* 12 C.F.R. § 1024.41(c)(2)(vi)(B).

11

Draft 3 – June 12, 2025

Although Flagstar argues that it made the December 2021 Offer based on an incomplete application, it neither notified Plaintiffs that their loan modification application was incomplete nor requested missing documentation before it made the December 2021 Offer. Because Flagstar did not satisfy the conditions required to make an offer based on an incomplete application, it was required to exercise reasonable diligence in requesting the quitclaim deed and divorce decree.

The question thus becomes whether Flagstar exercised such reasonable diligence. To do so, courts consider whether the servicer was able to request the particular additional information and, if so, whether it exercised reasonable diligence in collecting it. *Grutsch v. Wells Fargo Bank, N.A.*, No. 2:15-CV-2583, 2017 WL 1091681, at *6 (S.D. Ohio Mar. 23, 2017) (Graham, J.).

> **b)** **Flagstar was within its rights to request the quitclaim deed and divorce decree, but did not exercise reasonable diligence in obtaining those documents.**

Flagstar argues that it needed a quitclaim deed and divorce decree to complete Plaintiffs' application and remove Taijuana from Plaintiffs' offer paperwork. Plaintiffs allege that Flagstar's request for a quitclaim deed was in error, as Taijuana had no interest to convey—the divorce had terminated any latent rights she may have had.[3]

---

[3] Any dower interest that Taijuana had in Plaintiffs' home during her marriage to Mr. Ryan terminated upon their divorce. *Wells Fargo Bank, N.A. v. Kessler*, No. 15AP-216, 2015 WL 8196298, at *3 (Ohio Ct. App. Dec. 8, 2015) (citing Ohio Rev. Code § 2103.02) ("Divorce bars an ex-spouse from any dower right.").

Draft 3 – June 12, 2025

Servicers are "afforded latitude" in deciding what information they need to evaluate an application. *Schoen v. Bank of Am., N.A.,* No. 2:17-CV-648, 2019 WL 590882, at *7 (S.D. Ohio Feb. 13, 2019) (Jolson, M.J.). And Flagstar was well within its rights to request a quitclaim deed from Taijuana. Plaintiffs' mortgage is secured by the Federal Housing Authority ("FHA"), so Flagstar was required to consider the FHA's Single Family Housing Policy Handbook when modifying the mortgage loan's terms. (Gossett Decl., ¶ 4.) The FHA handbook required Flagstar to preserve the FHA's lien position when modifying a loan.[4] (*See* Ex. E, ECF No. 66-56.) In considering Plaintiffs' eligibility for loss mitigation, Flagstar reviewed a title report that did not show Mr. Ryan's divorce had been finalized. (Gossett Decl., ¶ 19; Ex. A-20.) If the Ryans were still married, Flagstar's lien position would have been subordinate to Taijuana's dower interest. *See Ferraro,* 2009 WL 2915617, at *9 (explaining that releasing a dower interest via the mortgage is not a complete release so long as the spouses are still married). It is reasonable, then, that Flagstar required that Mr. Ryan provide both a quitclaim deed and divorce decree before removing Taijuana from the loan modification offer.

The Court thus examines whether Flagstar exercised reasonable diligence in obtaining the quitclaim deed and divorce decree. Flagstar argues that it did, and that it is entitled to summary judgment because no reasonable jury could conclude otherwise. As to the December 2021 Offer, the Court disagrees.

---

[4] The FHA clarified in May 2022 that a quitclaim deed was not necessary to preserve the lien position when a borrower had since been divorced. (*Compare* Ex. E, PAGEID # 2304–05 *and* Ex. F, ECF No. 66-57, PAGEID # 2311–12.)

Draft 3 – June 12, 2025

Flagstar argues that Mr. Ryan's misleading statements to its agents caused Flagstar's delay in requesting the quitclaim deed and divorce decree, pointing to the recordings of the phone calls between Mr. Ryan and its agents for support. During those calls, Mr. Ryan represented that he and Taijuana were divorced. He also told Flagstar agents that Taijuana had nothing to do with the mortgage, that she had already released her dower rights, and that she was not on the title. Flagstar argues that these statements caused its agents significant confusion, and that it was reasonably diligent under the circumstances.

But Plaintiffs present evidence that Flagstar made misleading and conflicting statements about whether and when it would send revised paperwork, and whether a quitclaim deed was needed. In December 2021, a Flagstar agent told Mr. Ryan that they would remove Taijuana's name, but it neither sent revised paperwork nor requested additional documentation at that time. Then, in mid-January, another Flagstar agent told Mr. Ryan, on a single phone call, both that it did and did not need a quitclaim deed. At the end of January, a third Flagstar agent told Mr. Ryan that they had received a quitclaim deed (though Mr. Ryan never sent one). It was not until February 2022 that Flagstar unequivocally requested a quitclaim deed and divorce decree. At that point, two months had passed since Mr. Ryan told Flagstar that he was divorced, and more than a week had passed since the December 2021 Offer expired. Viewing the evidence in the light most favorable to Plaintiffs, as it must, the Court concludes that Flagstar fails to establish as a

Draft 3 – June 12, 2025

matter of law that it exercised reasonable diligence in its handling of the December 2021 Offer.

To the extent Count I is based on the December 2021 Offer, Flagstar's Motion for Summary Judgment on that claim is **DENIED**.

### 2. April 2022 Loan Modification Offer

The analysis is much simpler when it comes to the April 2022 Offer. Flagstar argues that it was reasonably diligent in handling the April 2022 Offer because it promptly requested a quitclaim deed, but Plaintiffs refused to provide one.

A Flagstar agent told Plaintiffs in February that they could re-apply for a loan modification, but advised that Taijuana would remain on any offer paperwork until Plaintiffs submitted a quitclaim deed and divorce decree. Plaintiffs submitted the divorce decree in March and Mr. Ryan told a Flagstar agent that he was still "working on" getting a quitclaim deed. In April, Mr. Ryan later told Flagstar that he did not believe a quitclaim deed was necessary, and he would not be providing one. But, as the Court has already explained, Flagstar gets to determine what documentation is necessary to evaluate a loan modification application—not Mr. Ryan. It is thus beyond dispute that Flagstar exercised reasonable diligence in handling the April 2022 Offer.

Plaintiffs make two arguments for the opposite conclusion. Neither is availing. First, Plaintiffs argue that Flagstar sent the April 2022 Offer to them with a known error—namely, that it included Taijuana. But before making the April 2022 Offer, Flagstar told Plaintiffs that removing Taijuana would require

Draft 3 – June 12, 2025

submission of a divorce decree and quitclaim deed. Plaintiffs did not submit a

quitclaim deed, so Flagstar did not err.

Second, Plaintiffs argue that Flagstar requested a divorce decree and

hardship letter in March 2022, after Plaintiffs had already provided those

documents.[5] The record reveals otherwise. Flagstar requested the divorce decree in

February 2022, which Plaintiffs provided in March. There is no evidence that

Flagstar requested a divorce decree again. As to the hardship letter, it is true that a

Flagstar agent suggested Plaintiffs could submit additional hardship letters to

determine whether they might be eligible for better loan modification terms. But

that does not equate to a request for documents Flagstar already had, or should not

have requested.

Thus, to the extent Count I is based on the April 2022 Offer, Flagstar's

Motion for Summary Judgment on that claim is **GRANTED**.

### B.    Count II: RESPA QWR Violation

Flagstar next argues that it is entitled to summary judgment on Count II,

which alleges that Flagstar failed to explain errors identified, or provide

information requested, in Plaintiffs' QWR.[6]

RESPA and Regulation X prescribe how loan servicers must respond to a

qualified written request, or QWR. A QWR is written correspondence, from a

---

[5] Plaintiffs also argue that Flagstar asked them to submit documents it already had in connection with the August 2022 Offer. This allegation does not appear in the Amended Complaint, so the Court will not consider it. *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 817 (6th Cir. 2020).

[6] Flagstar argues that Ms. Malone is not a proper party to Count II because

Draft 3 – June 12, 2025

borrower to a loan servicer, relating to loan servicing, that either identifies a potential error with a borrower's account or requests information from the servicer. 12 U.S.C. § 2605(e)(1). The first type of QWR is a notice of error ("NOE"). 12 C.F.R. § 1024.35. When a servicer receives an NOE, it must respond either by (i) correcting the borrower's account or (ii) providing written notice that, upon reasonable investigation, the servicer concluded no correction was necessary and why. 12 U.S.C. §§ 2605(e)(2)(A), (B); 12 C.F.R. § 1024.35(e)(1)(i).

The second type of QWR is a request for information ("RFI"). 12 C.F.R. § 1024.36. When a servicer receives an RFI, it must respond either by (i) providing the information requested or (ii) explain "why the information requested is unavailable or cannot be obtained" after a reasonable investigation. 12 U.S.C. § 2605(e)(2)(C); 12 C.F.R. §§ 1024.36(d)(i), (ii). Plaintiffs' QWR included both an NOE and an RFI; they allege that Flagstar failed to properly respond to each part.

### 1. Flagstar adequately responded to the NOE portion of the QWR.

The QWR notified Flagstar that Plaintiffs believed the difference in interest rates between the December 2021 and August 2022 Offers was an error. It asked Flagstar to either correct the error or explain the difference. Flagstar responded in

---

the QWR was sent by an attorney who said he represented Mr. Ryan, but did not mention Ms. Malone. Flagstar does not provide any legal authority to support the proposition that being named in the QWR is a prerequisite to bringing a QWR claim. Ms. Malone was a co-borrower on the mortgage that was the subject of the QWR, which Flagstar recognized when it addressed its response to both Plaintiffs by name. Flagstar thus fails to persuade the Court that Ms. Malone is not a proper party to the claim.

Draft 3 – June 12, 2025

October 2022 by offering to honor the December 2021 Offer terms. Assuming

without deciding that the difference in interest rates was an error, Flagstar

complied with RESPA by making an appropriate correction. To the extent Count II

is based on Flagstar's response to Plaintiffs' NOE, the Motion for Summary

Judgment is **GRANTED**.

> ### 2. The Court is unable to conclude that Flagstar adequately responded to the RFI.

Plaintiffs' QWR also requested nearly twenty-five categories of information

and records. Flagstar argues that this RFI was overbroad and unduly burdensome,

and that it thus adequately responded to their request.

Regulation X does not require servicers to respond to RFIs that are overbroad

(seek an "unreasonable volume of documents or information") or unduly

burdensome (cannot be answered promptly, even with diligence, or require an

unreasonable allocation of resources to respond). 12 C.F.R. § 1024.36(f)(iv). If a

servicer receives an overbroad or unduly burdensome RFI, it need only respond "[t]o

the extent it can reasonably identify a valid information request within [the]

submission." *Id*.

Flagstar responded to Plaintiffs' RFI by producing some of the requested

information, and informing Plaintiffs that the request for "all written

correspondence, call logs, servicing logs, audio recordings or transcripts of calls

related to their loan modification applications" was overbroad and unduly

burdensome. Flagstar argues that this response was adequate as a matter of law.

The Court disagrees. Flagstar admits that it had the requested call logs and

18

Draft 3 – June 12, 2025

recordings available. (Gossett Decl., ¶¶ 47–48.) But it argues that producing those would have required an unreasonable expenditure of resources. Namely, Flagstar would have had to review the call logs for privileged information, and search two repositories[7] for the recordings, which it could only download and send in small batches (of twenty and ten recordings, respectively). (*Id.*) Absent from Flagstar's argument is any indication of how much time, or how many resources, it would have taken to apply Flagstar's general process to Plaintiffs' specific RFI. Flagstar therefore fails to establish as a matter of law that its cursory response to the RFI was adequate. To the extent Count II is based on Flagstar's response to Plaintiffs' RFI, the Motion for Summary Judgment is **DENIED**.

### 3. The Court is unable to conclude that Plaintiffs have not suffered actual damages.

Finally, Flagstar argues that it is entitled to summary judgment on Count II because Plaintiffs were not harmed by any of the alleged QWR violations. "Recovery under RESPA requires more than establishing a violation." *Justice v. Ocwen Loan Servicing*, No. 2:13-CV-165, 2015 WL 235738, at *18 (S.D. Ohio Jan. 16, 2015) (Sargus, J.). A plaintiff must suffer actual, demonstrable damages, and the damages must occur "as a result of" the specific violation. *Id.* (citing 12 U.S.C. § 2605(f)(1)(A). "Damages are a necessary element of a RESPA claim." *Id.* Where, as here, there is

---

[7] Throughout their Motion for Summary Judgment and Reply, Flagstar represents that it stores recordings of telephone calls in two "suppositories." (*See, e.g.*, Mot., PAGEID # 1577, 1590, 1605; Gossett Decl., ¶¶ 48, 50; Reply, PAGEID # 2359.) The Court certainly hopes not. Instead, it will construe all such references as intended references to "repositories."

Draft 3 – June 12, 2025

no alleged pattern or practice of noncompliance, a borrower may pursue "any actual damages" resulting from the servicer's failure. 12 U.S.C. § 2605(f)(1)(A). Though RESPA does not define "actual damages," courts have interpreted the term to mean "all expenses, costs, fees, and injuries fairly attributable to [the servicer's] failure to respond appropriately to the QWR, even if incurred before the failure to respond." *Justice*, 2015 WL 235738, at *18 (citation omitted).

Plaintiffs argue that they suffered actual damages as a result of Flagstar's QWR failures. Namely, that they were denied the most favorable loan terms, that their credit scores were adversely affected, that they suffered emotional distress, and that they incurred costs associated with preparing the QWR.[8] (Ryan Decl., ¶ 47; Malone Dep., 31:18–35:16). This is sufficient to establish actual damages. *See Justice*, 2015 WL 235738, at *18 (finding that "the cost to prepare the QWR may qualify as actual damages"); *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 720–21 (6th Cir. 2013) (explaining that the costs associated with preparing a QWR are cognizable damages).

## IV.    CONCLUSION

For these reasons, Flagstar's Motion to Strike (ECF No. 79) is **GRANTED in part and DENIED in part**. Further, Flagstar's Motion for Summary Judgment (ECF No. 66) is:

- **GRANTED** to the extent Count I is based on the April 2022 Offer;

---

[8] Plaintiffs also argue that they were denied the most favorable loan terms as a result of Flagstar's QWR violations. These damages are tied to the NOE component of Count II. In light of the Court's ruling on that component, this damages allegation is now irrelevant.

20

Draft 3 – June 12, 2025

- **GRANTED** to the extent Count II is based on the NOE response; and

- **DENIED** in all other respects.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**